## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **DAVID L. STOCKMAN, M.D.,** **individually and as debtor in possession,** <br><br> Plaintiff, <br><br> v. <br><br> **FLINT TV LICENSE COMPANY, LLC D/B/A WJRT-TV AND ABC12; ALLEN MEDIA BROADCASTING, LLC; ALLEN MEDIA GROUP, LLC; ADVANCE LOCAL MEDIA LLC D/B/A MLIVE MEDIA GROUP AND MLIVE.COM; ADVANCE PUBLICATIONS, INC.; ASC COMMUNICATIONS, LLC D/B/A BECKER'S HEALTHCARE AND BECKER'S ASC REVIEW,** <br><br> Defendants. | Civil Action No.: 2:26-cv-3215-BHH-PJG <br><br> **VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br><br> RCV'D - USDC COLA SC <br> AUG 4 26 AM 10:42 |

Plaintiff David L. Stockman, M.D. ("Plaintiff"), appearing pro se, individually and as debtor in possession, brings this action against the above-named corporate media Defendants and alleges as follows:

### NATURE OF THE ACTION

1. This is an action arising from Defendants' transmission, publication, republication, and promotion of intentionally false and defamatory statements and materially false implications concerning Plaintiff, a physician whose ability to practice, obtain hospital privileges, and secure locum-tenens assignments depends upon professional trust and accurate credentialing information.

2. Defendants repeatedly converted disputed corporate obligations and procedural allegations into personal misconduct by Plaintiff; represented allegations as established facts;

described an arbitration award as a final court judgment; portrayed ordinary bankruptcy filings as proven schemes to evade judgments; falsely stated or implied that Plaintiff performed autopsies without required certification; falsely attributed corporate tax, banking, payroll, and equipment-lease matters to Plaintiff personally; and used misleading photographs, captions, headlines, and omissions to intensify those accusations.

3. The publications were disseminated through television broadcasts, websites, mobile applications, newsletters, social-media channels, search-engine feeds, and national healthcare-industry distribution. They reached hospitals, credentialing departments, staffing companies, physicians, patients, governmental bodies, and prospective business partners in South Carolina.

4. The challenged statements were false, materially misleading, or defamatory by implication. Defendants knew the underlying documents and procedural distinctions, possessed or had direct access to source records, and repeatedly published the same personal-misconduct narrative after facts contradicted it.

5. Plaintiff does not seek liability for accurate and substantially complete reporting of public records, protected opinion, or fair comment. Plaintiff challenges specific provably false statements, false attributions of personal conduct, and materially misleading implications created by headlines, words, omissions, images, captions, juxtaposition, and republication.

6. Plaintiff has suffered concrete actual injury in South Carolina, including termination of a confirmed pathology assignment at Trident Medical Center in Charleston after April 23, 2025; loss of fifty-nine remaining confirmed workdays; loss of a continuation assignment through AMN Healthcare in Columbia; diminished future earning capacity; injury to professional reputation; humiliation; emotional distress; and reputational-repair costs.

*Stockman v. Flint TV License Company, LLC, et al. - Complaint*

7. Plaintiff's presently identified special damages are no less than $364,200 and are approximately $396,450 when calculated from the full scheduled workday documented by the applicable staffing rate, exclusive of additional lost assignments, call compensation, future earning-capacity losses, general damages, and punitive damages.

8. This complaint follows the organizational structure of a conventional media-defamation complaint and separately identifies each publisher group, each challenged publication, the false meaning conveyed, the facts establishing falsity, and the resulting harm.

## THE PARTIES

9. Plaintiff David L. Stockman, M.D. is a physician and private citizen. He previously lived and worked in South Carolina, later returned to South Carolina for locum-tenens pathology assignments, and maintained substantial professional and economic relationships with South Carolina hospitals and staffing agencies.

10. Plaintiff is domiciled in Michigan and is a citizen of Michigan. He brings only his personal claims and claims he may administer as debtor in possession; he does not purport to represent a separate corporation pro se.

11. Plaintiff is the debtor in possession in a Chapter 11 case pending in the United States Bankruptcy Court for the Eastern District of Michigan, Case No. 26-20982-dob. To the extent any claim asserted here is property of the bankruptcy estate, Plaintiff brings it as debtor in possession and will comply with all bankruptcy disclosure, settlement, and approval requirements.

12. Defendant Flint TV License Company, LLC ("Flint TV") was, upon information and belief, the FCC licensee and direct publishing entity for WJRT-TV, branded as ABC12, during the relevant publications.

3

13. Defendant Allen Media Broadcasting, LLC ("Allen Broadcasting") owned, operated, managed, distributed, and exercised editorial authority over WJRT-TV and ABC12 during the relevant period.

14. Defendant Allen Media Group, LLC ("Allen Media Group") was, upon information and belief, a parent, affiliate, and controlling media enterprise that directly participated in, authorized, ratified, promoted, distributed, monetized, or retained the challenged ABC12 publications. Plaintiff does not rely on ownership alone and alleges direct participation and ratification subject to discovery.

15. Ryan Jeltema and Terry Camp were ABC12 reporters or on-air personnel who authored, produced, edited, narrated, broadcast, or participated in the challenged ABC12 publications while acting within the course and scope of their work for the ABC12 corporate Defendants. They are identified as agents and witnesses, not as defendants in this federal diversity action.

16. Defendant Advance Local Media LLC ("Advance Local") does business as, owns, operates, controls, or publishes MLive Media Group and MLive.com and distributed the challenged MLive publications through websites, newsletters, applications, affiliated newspapers, social-media channels, and syndicated platforms.

17. Defendant Advance Publications, Inc. ("Advance Publications") is, upon information and belief, a parent, affiliate, and controlling entity in the Advance media organization that directly participated in, authorized, ratified, promoted, distributed, monetized, or retained the challenged MLive publications. Plaintiff does not rely on parent status alone and alleges direct participation and ratification subject to discovery.

18.  Cole Waterman was an MLive reporter who authored, photographed, promoted, linked, republished, or otherwise participated in numerous challenged publications while acting within the course and scope of his work for the MLive corporate Defendants. He is identified as an agent and witness, not as a defendant in this federal diversity action.

19.  Defendant ASC Communications, LLC ("ASC Communications") does business as Becker's Healthcare and Becker's ASC Review and distributes healthcare-industry reporting to physicians, hospitals, health systems, staffing companies, credentialing professionals, and executives nationally, including in South Carolina.

20.  Patsy Newitt was a Becker's reporter or editor who authored, edited, or participated in the challenged Becker's ASC Review publications while acting within the course and scope of her work for ASC Communications. She is identified as an agent and witness, not as a defendant in this federal diversity action.

21.  The corporate relationships, editorial-control arrangements, publication analytics, republication channels, exact LLC memberships, and identities of all participating affiliates are peculiarly within Defendants' possession and are proper subjects for discovery.

## SUBJECT-MATTER JURISDICTION, PERSONAL JURISDICTION, AND VENUE

22.  This Court has original subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The matter in controversy exceeds $75,000, exclusive of interest and costs, because Plaintiff alleges presently identified direct economic damages of at least $364,200 and approximately $396,450, plus additional compensatory and punitive damages.

23.  Complete diversity exists. Plaintiff is a citizen of Michigan. Advance Publications, Inc. is, upon information and belief, incorporated and maintains its principal place of business outside Michigan. Each limited-liability-company Defendant is a citizen of every State in

5

which its members are citizens; upon information and belief after reasonable public inquiry, no Defendant has a member who is a citizen of Michigan.

24. The precise identities and citizenship of all members through each layer of the limited-liability-company Defendants are not publicly available to Plaintiff and are within Defendants' control. Plaintiff will promptly supplement jurisdictional allegations and disclosures after Defendants comply with Federal Rule of Civil Procedure 7.1 and Local Civil Rule 26.01(H) (D.S.C.).

25. Plaintiff has not named the Michigan reporters as defendants in this federal action. Their conduct is alleged as conduct of agents acting within the course and scope of the corporate Defendants' publishing operations.

26. This Court may exercise personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(1)(A) and South Carolina's long-arm statute because Defendants transacted and solicited business in South Carolina, distributed and monetized publications in South Carolina, and caused tortious injury in South Carolina through publications directed to or foreseeably used by South Carolina medical employers, staffing agencies, credentialing officials, and readers.

27. Defendants intentionally published material concerning Plaintiff while he maintained and pursued South Carolina medical work. By April 2025, the MLive Defendants expressly reported Plaintiff's South Carolina presence, South Carolina federal-court activity, and Charleston location, demonstrating actual knowledge of Plaintiff's connections to this State.

6

28. The MLive Defendants expressly made South Carolina and Charleston part of the subject matter of their April 2-3, 2025 publication and later continued publishing accusations while Plaintiff's South Carolina professional relationships were active or reasonably foreseeable.

29. The Becker's Defendants intentionally distributed the challenged publications to a specialized national healthcare audience that included South Carolina hospitals, health systems, physician employers, staffing agencies, credentialing officials, and medical professionals. Injury to Plaintiff's hospital employment and credentialing relationships in South Carolina was foreseeable and occurred.

30. The ABC12 corporate Defendants, through Allen Media's national and multistate operations, applications, websites, advertising, and digital distribution, transacted business and distributed the challenged content in South Carolina. Their publications were accessed and used in connection with Plaintiff's South Carolina professional relationships, causing injury in this State.

31. Venue is proper in the Charleston Division under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's damages occurred in Charleston. Plaintiff performed pathology services at Trident Medical Center in Charleston from April 21 through April 23, 2025 and, immediately thereafter, lost fifty-nine confirmed Charleston workdays allegedly because of Defendants' publications.

32. The CompHealth confirmation identified Trident Medical Center in Charleston as the worksite and set a schedule through October 3, 2025 at $1,800 per day. The Charleston employment loss is a central component of causation and damages. (Ex. N.)

7

33. Defendants' publications also injured Plaintiff's continuing South Carolina locum-tenens practice, including an established AMN Healthcare placement relationship at Hilton Head Hospital and a planned six-month continuation in Columbia. (Ex. O.)

34. If any Defendant disputes personal jurisdiction, venue, corporate identity, or publication targeting, Plaintiff requests limited jurisdictional and venue discovery before dismissal or transfer.

## TIMELINESS AND PUBLICATION

35. South Carolina provides a two-year limitations period for libel and slander. This action is tendered for filing on August 4, 2026, before the apparent two-year anniversaries of the August 5, 2024 ABC12 and MLive publications and the August 6, 2024 Becker's publication.

36. Plaintiff will diligently serve the summons and complaint within the time permitted by Federal Rule of Civil Procedure 4(m) and any applicable state-law commencement requirement, and preserves all rights arising from distinct republications, substantive updates, newsletters, push notifications, social-media posts, syndicated versions, and other separate publications occurring within the limitations period.

37. The June and July 2024 publications identified below are pleaded as background, context, knowledge, editorial-pattern, republication, and actual-malice evidence. Plaintiff does not rely upon their original publication dates as independent timely claims unless discovery establishes a legally distinct republication within the limitations period.

38. Each later challenged publication was a new article, headline, distribution event, and republication to a new or renewed audience. Defendants repeatedly inserted older accusations into new articles about unrelated subjects, creating separate defamatory publications and cumulative injury.

## COMMON FACTUAL ALLEGATIONS

39. Plaintiff is licensed as a medical doctor and has professional training and experience in pathology and forensic medicine. His employability depends on licensing, credentialing, hospital privileges, professional references, and confidence that he practices within lawful qualifications.

40. Defendants repeatedly referred to lawsuits, defaults, an arbitration, bankruptcies, tax matters, county contracts, employee allegations, and forensic-record disputes. The existence of such proceedings did not establish the truth of every accusation or permit Defendants to transform corporate allegations into personal conduct.

41. A procedural default is not a trial finding that Plaintiff personally performed every act alleged in an adversary's complaint. An arbitration award is not necessarily a final court judgment. A bankruptcy filing does not itself prove a subjective motive to evade a judgment. An investigation or referral is not a criminal charge or adjudication.

42. Defendants nevertheless presented those distinctions selectively or omitted them altogether, while repeatedly attaching unrelated allegations of professional misconduct to financial and procedural stories.

43. Defendants' cumulative narrative was especially damaging because it repeatedly stated or implied that Plaintiff was professionally unqualified, personally issued or caused worthless checks, personally defaulted on business banking obligations, personally contracted for equipment he did not lease, personally owed corporate taxes, deliberately withheld death certificates, and faced imminent loss of his medical licenses.

44. The challenged conduct includes both literal falsehoods and defamatory implications. The meaning of each publication arises from its headline, lead, body, images, captions, links, labels, omitted context, and repeated connection to other accusatory articles.

## THE CHALLENGED PUBLICATIONS AND FALSE THEMES

### A. August 5, 2024 ABC12 Publication

45.   On August 5, 2024, ABC12, through its reporter Ryan Jeltema, published "Embattled Saginaw County doctor, two others owe $130,000." (Ex. A.) The headline and report stated that Plaintiff and others owed more than $130,000 following a default judgment in favor of Wildfire Credit Union.

46.   The report attributed the underlying company-account conduct to Plaintiff personally and placed his image and identity at the center of the alleged banking activity.

47.   Plaintiff alleges that he did not personally open the subject draft account, did not personally own the account, did not personally deposit or redeposit the identified checks, did not personally initiate the challenged transfers, and did not perform the banking acts attributed to him.

48.   The account and transactions were associated with Great Lakes Bay Staffing or other separate business entities and persons. Defendants erased the distinction between the account holder, corporate participants, and Plaintiff personally.

49.   Plaintiff further alleges that counsel had agreed to extend the response deadline through August 2, 2024, while the default request was submitted on August 1, 2024. Defendants did not fairly explain that procedural context and instead conveyed that Plaintiff simply ignored the case and personally committed the alleged banking conduct.

50.   The publication thereby falsely implied personal dishonesty, deliberate manipulation of returned checks, and personal nonpayment by Plaintiff in his profession and business affairs.

10

**B. August 5, 2024 MLive Publication**

51.  On August 5, 2024, MLive, through its reporter Cole Waterman, published "Judge orders Saginaw Township doctor to pay $131K for not answering lawsuit." (Ex. B.)

52.  The article stated that Plaintiff ignored a lawsuit and then recited as fact detailed personal acts involving opening, depositing, transferring, and redepositing checks in a business account.

53.  Plaintiff did not personally perform those banking acts. Defendants relied on allegations from a default proceeding, yet narrated the allegations as Plaintiff's own conduct without distinguishing the corporate account, actual transactional actors, account authorizations, or procedural status.

54.  The article compounded the banking narrative by inserting unrelated allegations concerning equipment leases, other physicians, county contracts, and supposedly uncertified autopsies, creating the impression that the default established a broader pattern of personal fraud and professional lawlessness.

55.  The MLive article also supplied the source narrative that Becker's republished nationally the following day, magnifying the harm to Plaintiff's profession.

**C. August 6, 2024 Becker's ASC Review Publication**

56.  On August 6, 2024, Becker's, through its reporter Patsy Newitt, published "Michigan physician to pay $130K for not answering lawsuit." (Ex. C.)

57.  The article repeated MLive's personal-attribution narrative to a national healthcare audience, stating that Plaintiff opened the Wildfire account, deposited checks, transferred the funds, redeposited returned checks, and left the account overdrawn.

58. Those acts were not Plaintiff's personal transactions. The article failed to distinguish the separate corporate account, the persons who actually conducted the transactions, and the procedural nature of the default.

59. Because Becker's markets itself to physician leaders, healthcare executives, ambulatory surgery centers, hospitals, and credentialing stakeholders, the false personal-banking narrative foreseeably damaged Plaintiff's medical employment and professional standing, including in South Carolina.

**D. April 2-3, 2025 MLive South Carolina Publication**

60. On April 2, 2025, updated April 3, 2025, MLive, through its reporter Cole Waterman, published "Controversial Saginaw doctor who owes bank $141K skips court to file bankruptcy in South Carolina." (Ex. D.)

61. The headline stated as fact that Plaintiff "skips court" to file bankruptcy, conveying deliberate evasion and improper motive rather than neutrally reporting simultaneous proceedings.

62. The article expressly identified South Carolina, a Charleston lodging location, and Plaintiff's federal-court activity in South Carolina. It therefore placed Plaintiff's conduct and reputation in this State at the center of the publication.

63. The article stated that TIAA "agreed to lease Stockman and SPP" equipment and that "Stockman/SPP" did not make payments or return it.

64. Plaintiff never signed a TIAA lease in his individual capacity, never personally entered a TIAA contract, and never signed a personal guaranty for the leases. Any lease was with Specialized Pathology Partners or another corporate entity.

12

65. Whether Plaintiff was a lessee or guarantor was objectively verifiable from the lease and signature pages. Defendants nevertheless transformed an entity-level equipment dispute into personal contracting and personal retention of equipment.

66. The article again repeated that Plaintiff performed autopsies without proper certification, without identifying any required certificate, statute, licensing body, disciplinary determination, or adjudication establishing that claim.

67. By combining the words "skips court," personal TIAA obligations, bankruptcy, and allegedly uncertified autopsies, the publication conveyed a false composite meaning of deliberate financial evasion and unlawful medical practice.

### E. April 9, 2025 Becker's Publication

68. On April 9, 2025, Becker's, through its reporter Patsy Newitt, published "Michigan physician files for bankruptcy, delaying $551K defamation judgment." (Ex. E.)

69. At the time of publication, the $551,800 matter was an arbitration opinion or award issued by a retired judge acting as arbitrator and had not become the final court judgment represented by the headline and summary.

70. The article stated that "a judge" determined Plaintiff acted with intent and malice, without fairly distinguishing the arbitrator's role, the lack of a confirmed final judgment, the pending judicial process, or the effect of the bankruptcy stay.

71. The article further repeated that Plaintiff allegedly performed autopsies without certification, again without identifying a legally required certificate that Plaintiff lacked.

72. The article stated that two additional doctors, including one "from Harvard Medical School," were suing Plaintiff and that "These cases are pending." Plaintiff alleges the Odze action had been dismissed before this publication and was no longer pending.

73.  The description of Odze as a current physician "from Harvard Medical School" materially enhanced the apparent authority of the accusation even though, upon information and belief, his Harvard affiliation had ended years earlier.

74.  The headline and summary therefore falsely converted an unconfirmed arbitration award into a judgment, portrayed bankruptcy as a delay tactic, repeated a professional-qualification falsehood, and misrepresented the status and institutional affiliation of another claimant to a national healthcare audience.

## F. May 6, 2025 MLive Bankruptcy Publication

75.  On May 6, 2025, MLive, through its reporter Cole Waterman, published "Saginaw Township doctor files last-minute bankruptcy, again, to avoid $551K judgment." (Ex. G.)

76.  The headline stated Plaintiff's subjective motive - "to avoid" a judgment - as an established fact. No court had found that the bankruptcy was filed for that improper purpose.

77.  The article described a $551,800 judgment even though the matter had arisen from an arbitration award and the confirmation and bankruptcy proceedings had not produced the final judgment represented by the headline at the time of publication.

78.  The article used mocking labels attributed to opposing counsel and again inserted accusations concerning uncertified autopsies and other disputes, reinforcing the predetermined narrative that Plaintiff was dishonest and professionally unqualified.

79.  The article's characterization of motive, procedural status, and professional conduct was materially misleading and foreseeably reached South Carolina medical decisionmakers while Plaintiff was actively working in Charleston.

**G. May 2025 MLive/MSN Oregon-Physician Publication**

80. In May 2025, MLive, through its reporter Cole Waterman, published and syndicated through MSN "Oregon physician sues Saginaw Township doctor, again, in hopes of getting $21K she's owed."

81. The article stated that the Odze and Jayakumar matters were pending, repeatedly personalized corporate employment and payment disputes, and repeated that TIAA leased equipment to Plaintiff and SPP personally.

82. Plaintiff alleges the Odze action had been dismissed and was not pending. Plaintiff further alleges he did not personally employ or personally owe Jayakumar and did not personally sign a TIAA lease or guaranty.

83. The article appended the statement that Plaintiff's medical and controlled-substance licenses "expire Sept. 8," without explaining that September 8 was the ordinary expiration-and-renewal date for all physicians in Michigan.

84. In the context of repeated accusations, the unexplained license sentence falsely implied that Plaintiff faced imminent loss or nonrenewal of his medical authority because of misconduct.

**H. May 21, 2025 MLive "UP Officials" Publication and Staged Image**

85. On May 21, 2025, MLive, through its reporter Cole Waterman, published "UP officials drive 6 hours to confront Saginaw doctor accused of withholding 43 death certificates." (Ex. H.)

86. The headline and article falsely or misleadingly equated incomplete reports, toxicology, cause-and-manner determinations, records-transfer issues, and work assigned to medical examiners or forensic pathologists with Plaintiff's intentional personal "withholding" of forty-three completed death certificates.

15

87. Plaintiff was not the chief medical examiner for the counties at issue and did not personally possess unilateral legal authority to sign or release every document described. The matters involved multiple counties, assigned medical examiners, pathologists, staff, incomplete reports, toxicology, and certification processes.

88. The article itself acknowledged that staff provided numerous reports and cremains, facts inconsistent with a simple narrative of Plaintiff intentionally concealing forty-three completed death certificates.

89. The principal photograph, credited to Waterman, depicted a marked Marquette County Sheriff's vehicle positioned immediately behind the MIFSM sign.

90. Upon information and belief, the vehicle was deliberately positioned, or its position was coordinated or materially arranged, so Waterman could create the visual impression of a police confrontation, raid, criminal investigation, or enforcement action at Plaintiff's facility.

91. No raid, search, arrest, seizure, or criminal enforcement action occurred during the visit described in the article. The officials were involved in a contractual records dispute.

92. Because Waterman personally took the photograph, he knew the circumstances under which the vehicle was positioned. The use of the staged or materially arranged image with the words "confront," "withholding," and "stonewalled" created a false visual implication of law-enforcement action against Plaintiff.

93. The article again repeated that Plaintiff performed autopsies without proper certification and again personalized TIAA and other company obligations, layering unrelated accusations into the records dispute.

16

### I. May 30, 2025 MLive IRS Publication

94. On May 30, 2025, MLive, through its reporter Cole Waterman, published "IRS seeks $74,204 in back taxes from controversial Saginaw doctor." (Ex. I.)

95. The headline identified Plaintiff personally as the taxpayer. The article reinforced that assertion by stating that "the IRS is targeting him" and that "[t]he levy states Stockman owes $74,204.14 in taxes dating to 2021."

96. Those statements were false. Plaintiff alleges the taxpayer identified by the levy was Michigan Institute of Forensic Science and Medicine, a separate business entity, not Plaintiff individually.

97. The fact that a levy attached to money associated with a company or county contract did not transform the company's tax obligation into Plaintiff's personal tax debt.

98. The identity of the taxpayer was objectively verifiable from the levy. Waterman purported to describe the levy and therefore knew, recklessly disregarded, or purposefully avoided the entity identity shown in the document.

99. The article again stated that TIAA leased equipment to Plaintiff personally, again repeated the supposedly uncertified-autopsy accusation, and again concluded with the statement that Plaintiff's licenses "expire Sept. 8."

100. The combined message falsely portrayed Plaintiff as a personal federal tax delinquent, personal equipment debtor, unqualified physician, and doctor about to lose his license.

### J. Background Publications Showing Knowledge and Editorial Pattern

101. On June 14, 2024, MLive, through its reporter Cole Waterman, published "AG's Office to weigh in on if beleaguered Saginaw Township doctor will face charges." (Ex. J.) MLive placed a large archival photograph of Michigan Attorney General Dana Nessel directly beneath the headline.

*Stockman v. Flint TV License Company, LLC, et al. - Complaint*

102. The caption disclosed that the photograph was taken at an unrelated September 19, 2022 press conference. Nessel did not pose for the article, did not personally speak about Plaintiff in the article, and was not shown addressing Plaintiff's matter.

103. The deliberate use, size, and placement of the unrelated image created the false visual implication that the Attorney General personally announced, endorsed, or discussed possible charges against Plaintiff.

104. That June 14 article also repeated the uncertified-autopsy and personal-TIAA narratives, demonstrating that those accusations had become standardized editorial background rather than facts verified for each new publication.

105. On June 14, 2024, ABC12 and Camp published a health-care-fraud-investigation report that repeatedly associated company payroll allegations and bounced checks with Plaintiff personally. Plaintiff uses that publication as background, knowledge, and actual-malice evidence unless a timely distinct republication is established.

106. On July 15, 2024, Becker's, through its reporter Patsy Newitt, published "Dermatologist claims Michigan physician owes him $142K in wages." (Ex. L.) It described Jayakumar as Plaintiff's employee, stated Plaintiff personally paid him, and separately reported Higgs's allegation that Plaintiff personally "paid him with bounced checks."

107. Plaintiff did not personally employ Jayakumar, did not personally issue the described payment, did not personally write or issue a check to Higgs, and did not personally assume the corporate payroll obligations. The article transformed company employment and payroll allegations into personal conduct.

108. On July 31, 2024, MLive, through its reporter Cole Waterman, published another article that repeated the Odze, Jayakumar, TIAA, payroll, and supposedly uncertified-autopsy

18

narratives in connection with a court-procedure story, further demonstrating a deliberate pattern of repetition and personalization.

## REPEATED FALSE ACCUSATION OF AUTOPSIES WITHOUT PROPER CERTIFICATION

109. Across numerous unrelated publications, the MLive and Becker's Defendants repeatedly stated that Plaintiff performed autopsies "without proper certification" or "despite not having proper certification to do so."

110. The accusation was false. Plaintiff was a licensed physician and alleges he possessed the professional and legal authorization applicable to the autopsies he performed or participated in.

111. Defendants never identified the supposed certificate, the governmental entity that issued it, the statute or rule requiring it, the date Plaintiff supposedly lost or failed to obtain it, or any final licensing or judicial determination that Plaintiff performed an autopsy unlawfully for lack of a required credential.

112. The phrase communicated to hospitals, staffing companies, credentialing bodies, physicians, patients, and the public that Plaintiff lacked a legally required medical qualification yet performed invasive procedures anyway.

113. That accusation directly attacked Plaintiff in his profession, impugned his competence and lawful scope of practice, and was foreseeably destructive to pathology assignments and hospital privileges.

114. Defendants repeatedly inserted the accusation into articles about banking, bankruptcy, tax, equipment, employment, and records disputes that had no legitimate need to address autopsy qualifications.

115. The repetition converted an unsupported allegation into an apparently settled fact and supports an inference that Defendants adopted a predetermined narrative while purposefully avoiding contrary licensing and authorization records.

## REPEATED FALSE LICENSE-EXPIRATION IMPLICATION

116. MLive and Waterman repeatedly ended accusatory articles with the sentence that Plaintiff's licenses to practice medicine and prescribe controlled substances "remain active" but "are set to expire Sept. 8" or "expire Sept. 8."

117. Defendants omitted the essential fact that September 8 was the ordinary expiration-and-renewal date applicable to all physicians in Michigan. The date was not unique to Plaintiff and did not arise from discipline, suspension, restriction, revocation, surrender, or anticipated denial of renewal.

118. Plaintiff's controlled-substance license carried the same date as part of the ordinary licensing cycle, not as a second warning or impending sanction.

119. By using the word "remain" and emphasizing that the licenses were "set to expire" immediately after allegations of wrongdoing, Defendants conveyed that Plaintiff's licenses were temporarily still valid but about to terminate because of misconduct.

120. Defendants did not identify any pending action threatening Plaintiff's licenses. The repeated sentence served no material purpose in stories about banking, taxes, bankruptcy, equipment, or private wage disputes except to suggest that Plaintiff's medical career was about to end.

121. That implication was foreseeably harmful to hospital credentialing officials and staffing agencies deciding whether Plaintiff could complete future assignments in South Carolina.

*Stockman v. Flint TV License Company, LLC, et al. - Complaint*

## KNOWLEDGE, RECKLESS DISREGARD, AND ACTUAL MALICE

122. Defendants possessed, quoted, described, photographed, or had direct access to the records necessary to determine the taxpayer, contracting party, account holder, procedural posture, licensing status, and nature of the governmental proceedings they reported.

123. Whether Plaintiff signed a TIAA lease or personal guaranty was verifiable from signature pages. Whether the IRS levy named Plaintiff or MIFSM was verifiable from the levy. Whether the Bush matter was an arbitration award or final judgment was verifiable from the docket and order. Whether Odze's case was pending was verifiable from the court docket.

124. Waterman had firsthand knowledge of how the sheriff-vehicle photograph was composed and that Dana Nessel's archival photograph did not depict her speaking about Plaintiff.

125. Defendants repeatedly used the same false or misleading phrases across unrelated articles, showing that the statements were not isolated typographical errors but components of an editorial narrative.

126. Defendants repeatedly personalized corporate conduct even where the articles themselves identified separate entities, account holders, employers, and corporate contracts.

127. Defendants failed to identify a specific missing autopsy certificate or any licensing adjudication, yet continued repeating the accusation to general and professional audiences.

128. Defendants emphasized the routine September 8 renewal date while omitting that it applied to all physicians in Michigan, despite obtaining the date from licensing records that showed Plaintiff's licenses were active.

129. The headlines and visual presentation were designed to maximize accusation and search-engine impact: "embattled," "controversial," "skips court," "to avoid," "confront," "withholding," personal IRS debt, and supposedly expiring licenses.

130. Plaintiff alleges Defendants knew the challenged meanings were false, entertained serious doubts about their truth, purposefully avoided readily available contradictory facts, or acted with reckless disregard for the truth and Plaintiff's rights.

131. Plaintiff further alleges common-law malice, including ill will, a design to causelessly and wantonly injure Plaintiff, or publication with such reckless indifference to his rights as to be equivalent to an intent to injure.

## SOUTH CAROLINA INJURY AND SPECIAL DAMAGES

132. Plaintiff previously lived and worked in South Carolina and returned to provide locum-tenens pathology services at South Carolina hospitals.

133. CompHealth issued a written confirmation for Plaintiff to provide pathology services at Trident Medical Center, 9330 Medical Plaza Drive, Charleston, South Carolina, from April 21 through October 3, 2025 in thirteen scheduled work blocks.

134. The CompHealth assignment contained sixty-two scheduled workdays at $1,800 per day, for a total scheduled value of $111,600.

135. Plaintiff completed the first three scheduled days, April 21 through April 23, 2025, and was terminated from the assignment after April 23 because of the media reports concerning him.

136. Fifty-nine confirmed workdays remained. At $1,800 per day, Plaintiff lost $106,200 in confirmed CompHealth compensation.

137. Michelle Puzey, the CompHealth staffing consultant identified in the confirmation, is a witness to the assignment, schedule, termination, client communications, and causation.

138. Plaintiff also had an established placement relationship with AMN Healthcare, which placed him at Hilton Head Hospital in South Carolina at a regular rate of $250 per hour.

139. The AMN confirmation identified Ingrid Head as Plaintiff's recruiter. The same staffing and client relationship planned to continue Plaintiff at a different South Carolina location, MUSC Columbia, from January through June 2026.

140. Ingrid Head can confirm the planned Columbia placement, anticipated six-month duration, schedule, compensation, credentialing, and reason it did not proceed.

141. January through June 2026 contained 129 weekdays. At eight compensable hours per weekday and $250 per hour, the conservative AMN loss is $258,000.

142. Using the documented 8:00 a.m. to 5:00 p.m. scheduled period, the schedule-based AMN loss is approximately $290,250.

143. Plaintiff's presently identified direct economic loss is therefore no less than $364,200 and approximately $396,450 based on the full scheduled workday.

144. These figures exclude lost call, callback, holiday and overtime compensation; additional lost assignments; reduced future earning capacity; reputational-repair expenses; general reputational damages; humiliation; emotional distress; and other consequential losses.

145. The specific losses provide direct evidence that Defendants' publications deterred third persons from associating or dealing with Plaintiff and damaged his reputation in the medical profession.

## LEGAL ELEMENTS AND DAMAGES STANDARD

146. Under South Carolina law, defamation requires a false and defamatory statement concerning the plaintiff, unprivileged publication to a third party, fault on the publisher's part, and either actionability irrespective of special harm or special harm caused by the publication. Plaintiff pleads both literal falsity and defamation by implication.

147. To the extent the First Amendment requires proof of constitutional actual malice because of Plaintiff's status or the subject matter, Plaintiff pleads that Defendants published with knowledge of falsity or reckless disregard for truth, and he seeks to prove that standard by clear and convincing evidence.

148. Plaintiff pleads direct special damages rather than relying solely on presumed injury. The written staffing confirmations, named recruiters, terminated Charleston schedule, and planned Columbia continuation identify third-party conduct and quantifiable losses caused by the publications.

149. Plaintiff seeks punitive damages because the repeated publications, purposeful personalization of entity conduct, misleading images, omission of readily verifiable facts, and continued use of false professional accusations were wilful, wanton, reckless, and malicious.

## CAUSES OF ACTION

### COUNT I - DEFAMATION AND LIBEL ACTIONABLE PER SE (ABC12 DEFENDANTS)

150. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

151. This Count is asserted against Flint TV License Company, LLC, Allen Media Broadcasting, LLC, and Allen Media Group, LLC.

24

152. Defendants published false and defamatory statements concerning Plaintiff to third parties without privilege.

153. The statements and implications accused Plaintiff of criminal, dishonest, unethical, and professionally disqualifying conduct; directly prejudiced him in his profession; and tended to lower him in the estimation of the community and deter others from associating or dealing with him.

154. Defendants were at fault because they acted negligently, knowingly, with reckless disregard for truth or falsity, and with constitutional and common-law actual malice to the extent those standards apply.

155. Any fair-report or qualified privilege was inapplicable or abused because Defendants materially altered the meaning of records, omitted decisive facts, personalized entity conduct, presented allegations as fact, and published statements or implications not fairly contained in the proceedings purportedly reported.

156. The ABC12 Defendants falsely attributed Wildfire company-account transactions and corporate payroll allegations to Plaintiff personally and published a false professional and financial narrative that injured Plaintiff in his occupation.

157. As a direct and proximate result, Plaintiff suffered actual and special damages, including lost South Carolina income, loss of professional opportunities, reputational injury, humiliation, emotional distress, future earning-capacity loss, and corrective expenses.

158. The conduct was wilful, wanton, reckless, and malicious, entitling Plaintiff to punitive damages upon clear and convincing proof and subject to South Carolina law.

## COUNT II - DEFAMATION BY IMPLICATION AND PER QUOD (ABC12 DEFENDANTS)

159. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

160. This Count is asserted against Flint TV License Company, LLC, Allen Media Broadcasting, LLC, and Allen Media Group, LLC.

161. Defendants published false and defamatory statements concerning Plaintiff to third parties without privilege.

162. The statements and implications accused Plaintiff of criminal, dishonest, unethical, and professionally disqualifying conduct; directly prejudiced him in his profession; and tended to lower him in the estimation of the community and deter others from associating or dealing with him.

163. Defendants were at fault because they acted negligently, knowingly, with reckless disregard for truth or falsity, and with constitutional and common-law actual malice to the extent those standards apply.

164. Any fair-report or qualified privilege was inapplicable or abused because Defendants materially altered the meaning of records, omitted decisive facts, personalized entity conduct, presented allegations as fact, and published statements or implications not fairly contained in the proceedings purportedly reported.

165. Through headlines, images, omissions, aggregation of unrelated accusations, and criminal-investigation framing, the ABC12 Defendants created the materially false implication that Plaintiff personally committed financial misconduct and was established to have engaged in healthcare fraud or unlawful professional conduct.

166. As a direct and proximate result, Plaintiff suffered actual and special damages, including lost South Carolina income, loss of professional opportunities, reputational injury, humiliation, emotional distress, future earning-capacity loss, and corrective expenses.

167. The conduct was wilful, wanton, reckless, and malicious, entitling Plaintiff to punitive damages upon clear and convincing proof and subject to South Carolina law.

## COUNT III - DEFAMATION AND LIBEL ACTIONABLE PER SE (MLIVE DEFENDANTS)

168. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

169. This Count is asserted against Advance Local Media LLC and Advance Publications, Inc.

170. Defendants published false and defamatory statements concerning Plaintiff to third parties without privilege.

171. The statements and implications accused Plaintiff of criminal, dishonest, unethical, and professionally disqualifying conduct; directly prejudiced him in his profession; and tended to lower him in the estimation of the community and deter others from associating or dealing with him.

172. Defendants were at fault because they acted negligently, knowingly, with reckless disregard for truth or falsity, and with constitutional and common-law actual malice to the extent those standards apply.

173. Any fair-report or qualified privilege was inapplicable or abused because Defendants materially altered the meaning of records, omitted decisive facts, personalized entity conduct, presented allegations as fact, and published statements or implications not fairly contained in the proceedings purportedly reported.

174. The MLive Defendants published the specific literal falsehoods and personal attributions described above, including personal IRS liability, personal TIAA contracting, personal Wildfire transactions, uncertified autopsies, intentional withholding, and inaccurate litigation status.

27

175. As a direct and proximate result, Plaintiff suffered actual and special damages, including lost South Carolina income, loss of professional opportunities, reputational injury, humiliation, emotional distress, future earning-capacity loss, and corrective expenses.

176. The conduct was wilful, wanton, reckless, and malicious, entitling Plaintiff to punitive damages upon clear and convincing proof and subject to South Carolina law.

## COUNT IV - DEFAMATION BY IMPLICATION AND PER QUOD (MLIVE DEFENDANTS)

177. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

178. This Count is asserted against Advance Local Media LLC and Advance Publications, Inc.

179. Defendants published false and defamatory statements concerning Plaintiff to third parties without privilege.

180. The statements and implications accused Plaintiff of criminal, dishonest, unethical, and professionally disqualifying conduct; directly prejudiced him in his profession; and tended to lower him in the estimation of the community and deter others from associating or dealing with him.

181. Defendants were at fault because they acted negligently, knowingly, with reckless disregard for truth or falsity, and with constitutional and common-law actual malice to the extent those standards apply.

182. Any fair-report or qualified privilege was inapplicable or abused because Defendants materially altered the meaning of records, omitted decisive facts, personalized entity conduct, presented allegations as fact, and published statements or implications not fairly contained in the proceedings purportedly reported.

28

183. Through accusatory headlines, a staged or materially arranged sheriff-vehicle image, an unrelated Dana Nessel photograph, routine license-expiration language, omissions, juxtaposition, labels, links, and repeated republication, the MLive Defendants created a materially false implication that Plaintiff was under law-enforcement action, professionally unqualified, personally delinquent, and about to lose his medical licenses.

184. As a direct and proximate result, Plaintiff suffered actual and special damages, including lost South Carolina income, loss of professional opportunities, reputational injury, humiliation, emotional distress, future earning-capacity loss, and corrective expenses.

185. The conduct was wilful, wanton, reckless, and malicious, entitling Plaintiff to punitive damages upon clear and convincing proof and subject to South Carolina law.

## COUNT V - DEFAMATION AND LIBEL ACTIONABLE PER SE (BECKER'S DEFENDANTS)

186. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

187. This Count is asserted against ASC Communications, LLC.

188. Defendants published false and defamatory statements concerning Plaintiff to third parties without privilege.

189. The statements and implications accused Plaintiff of criminal, dishonest, unethical, and professionally disqualifying conduct; directly prejudiced him in his profession; and tended to lower him in the estimation of the community and deter others from associating or dealing with him.

190. Defendants were at fault because they acted negligently, knowingly, with reckless disregard for truth or falsity, and with constitutional and common-law actual malice to the extent those standards apply.

191. Any fair-report or qualified privilege was inapplicable or abused because Defendants materially altered the meaning of records, omitted decisive facts, personalized entity conduct, presented allegations as fact, and published statements or implications not fairly contained in the proceedings purportedly reported.

192. The Becker's Defendants nationally republished false personal banking and payroll attributions, described an arbitration award as a final defamation judgment, repeated the uncertified-autopsy accusation, and misstated the status and institutional affiliation of another claimant.

193. As a direct and proximate result, Plaintiff suffered actual and special damages, including lost South Carolina income, loss of professional opportunities, reputational injury, humiliation, emotional distress, future earning-capacity loss, and corrective expenses.

194. The conduct was wilful, wanton, reckless, and malicious, entitling Plaintiff to punitive damages upon clear and convincing proof and subject to South Carolina law.

## COUNT VI - DEFAMATION BY IMPLICATION AND PER QUOD (BECKER'S DEFENDANTS)

195. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

196. This Count is asserted against ASC Communications, LLC.

197. Defendants published false and defamatory statements concerning Plaintiff to third parties without privilege.

198. The statements and implications accused Plaintiff of criminal, dishonest, unethical, and professionally disqualifying conduct; directly prejudiced him in his profession; and tended to lower him in the estimation of the community and deter others from associating or dealing with him.

30

*Stockman v. Flint TV License Company, LLC, et al. - Complaint*

199. Defendants were at fault because they acted negligently, knowingly, with reckless disregard for truth or falsity, and with constitutional and common-law actual malice to the extent those standards apply.

200. Any fair-report or qualified privilege was inapplicable or abused because Defendants materially altered the meaning of records, omitted decisive facts, personalized entity conduct, presented allegations as fact, and published statements or implications not fairly contained in the proceedings purportedly reported.

201. Through healthcare-industry distribution, headlines, summaries, omission of corporate and procedural distinctions, and reliance on the MLive narrative, the Becker's Defendants falsely implied that Plaintiff was personally dishonest, professionally unqualified, and unfit for medical employment or credentialing.

202. As a direct and proximate result, Plaintiff suffered actual and special damages, including lost South Carolina income, loss of professional opportunities, reputational injury, humiliation, emotional distress, future earning-capacity loss, and corrective expenses.

203. The conduct was wilful, wanton, reckless, and malicious, entitling Plaintiff to punitive damages upon clear and convincing proof and subject to South Carolina law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendants, jointly and severally to the extent permitted by law, and requests:

- Compensatory damages in an amount determined by the jury;

- Special damages presently known to be no less than $364,200 and approximately $396,450 based on the documented schedules, plus all additional economic damages proved at trial;

*Stockman v. Flint TV License Company, LLC, et al. - Complaint*

- Damages for lost earning capacity, lost assignments, reputational injury, humiliation, emotional distress, consequential harm, and reputational-repair expenses not less than $383,472,092;

- Nominal damages where authorized;

- Punitive damages, without pleading a specific punitive amount, upon clear and convincing proof of wilful, wanton, reckless, or constitutionally malicious conduct;

- Any enhanced or multiple damages expressly authorized by applicable law and established by the evidence, without asserting that ordinary defamation damages are automatically trebled;

- A declaration after final adjudication identifying the specific statements and implications found false and defamatory;

- Narrowly tailored post-judgment correction, removal, or corrective-publication relief concerning statements adjudicated false, only to the extent permitted by the First Amendment and applicable law;

- Prejudgment and post-judgment interest as allowed by law;

- Taxable costs; and

- All other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on every issue so triable.

Respectfully submitted,

David L. Stockman, M.D.
Plaintiff, Pro Se, individually and as debtor in possession

*Stockman v. Flint TV License Company, LLC, et al. - Complaint*

3871 Fortune Boulevard
Saginaw, Michigan 48603
Telephone: (989) 341-3017
Email: dstockma4@icloud.com
Dated: August 4, 2026

## DECLARATION UNDER 28 U.S.C. § 1746

I declare under penalty of perjury that I have read the foregoing Complaint; that the factual

allegations stated from my personal knowledge are true and correct; and that allegations stated

on information and belief are believed to be true after reasonable inquiry. I understand that

Federal Rule of Civil Procedure 11 applies to this filing.

Executed on August 4, 2026.

David L. Stockman, M.D.

33